**PACIFIC TRIAL ATTORNEYS**
A Professional Corporation
Scott J. Ferrell, Bar No. 202091
sferrell@pacifictrialattorneys.com
4100 Newport Place Drive, Suite 800
Newport Beach, California 92660
Telephone: (949) 706-6464
Facsimile: (949) 706-6469

Attorneys for Plaintiff

**UNITED STATE DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

REBEKA RODRIGUEZ, individually and on behalf of all others similarly situated,

Plaintiff,

v.

JP BODEN SERVICES INC., a Delaware corporation d/b/a BODENUSA.COM,

Defendant.

Case No. 3:23-cv-00534-L-WVG

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S RESPONSE IN OPPOSITION TO MOTION TO DISMISS FIRST AMENDED COMPLAINT AND MOTION TO COMPEL ARBITRATION**

[Declarations of Rebeka Rodriguez and Scott J. Ferrell filed concurrently herewith]

Date: June 26, 2023
Time: 10:30 a.m.
Courtroom: N/A
Judge: Hon. M. James Lorenz

## TABLE OF CONTENTS

**Page(s)**


I. ARGUMENT .......... 1

A. The FAC Sufficiently Pleads a Non-Frivolous VPPA Claim. .......... 1

1. Defendant Is a "Video Tape Service Provider" Under the VPPA. .......... 1

2. Plaintiff Is a "Consumer" as Defined by the VPPA. .......... 3

a. The FAC Plausibly Alleges that Plaintiff Is a "Purchaser". .......... 3

b. The FAC Plausibly Alleges that Plaintiff Is a "Subscriber". .......... 5

3. The FAC Sufficiently Alleges Defendant's Disclosure of Plaintiff's Personally Identifiable Information to Facebook and Defendant's Knowledge of Such Disclosures. .......... 9

a. The FAC's Allegations that Defendant Knowingly Disclosed Plaintiff's PII to Facebook Is Plausible. .......... 10

b. The Figures in the FAC Are Purely for Illustrative Purposes Only. .......... 11

B. The Declaration of Peter Brann Proves Nothing .......... 12

C. If a Curable Defect Remains, Leave to Amend Should Be Granted .......... 13

D. The Arbitration Clause Is Unenforceable Due to Lack of Actual Notice to Plaintiff. .......... 13

E. The "Terms & Conditions" Hyperlink Buried at the Bottom of Footer of Each Webpage Is Insufficient Under Ninth Circuit Case Law to Amount to Constructive Notice. .......... 14

1. There Is No Evidence that Plaintiff Was Aware that She Was Binding Herself to Defendant's Terms & Conditions Merely By Using the Website. .......... 15

2. The Design and Content of the Website Did Not Make the Terms & Conditions Readily and Obviously Available to the User. .......... 15

c. There Is No Mechanism that Forces the User to Actually Examine Defendant's Terms & Conditions. .......... 16

d. Defendant Failed to Design Its Website to Provide an Explicit Textual Notice or Admonition to Review Its Terms & Conditions. ... 17

e. Neither the "Terms & Conditions" Name for the Hyperlink at Issue Nor the Title of the Actual Hyperlinked Document Are Self-Defining. ... 18

f. The Hyperlink Is Subtle. ... 19

g. The "Terms & Conditions" Hyperlink at the Bottom of Each Webpage Is Buried Amongst 24 Hyperlinks. ... 22

3. The Third *Berkson* Factor Is Neutral. ... 22

4. Defendant Did Not Clearly Draw the Consumer's Attention to Material Terms that Would Alter What a Reasonable Consumer Would Understand to Be Her Default Rights When Initiating an Online Consumer Transaction From the Consumer's State of Residence. ... 22

5. Plaintiff's Status as a "Tester" Proves Nothing About the Constructive Notice Analysis. ... 23

6. The Court Should Disregard Defendant's Bald Contention that Plaintiff's Counsel's Knowledge Should Be Counted as Plaintiff's Constructive Knowledge. ... 24

7. The Recent Decision in *Byars v. The Goodyear Tire and Rubber Co.* Is Directly on Point. ... 24

F. Defendant Has Waived the Enforcement of the Arbitration Clause. ... 24

G. Whether "Gateway" Issues of Arbitrability Such as Enforceability Were Delegated to the Arbitrator Is Irrelevant to Deciding the Instant Motion. ... 25

## TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Ambrose v. Boston Globe Media Partners LLC*,
2022 WL 4329373 (D. Mass. Sept. 19, 2022) ........................................2, 10, 11

*Applebaum v. Lyft, Inc.*,
263 F. Supp. 3d 454 (S.D.N.Y. 2017) ........................................................19, 21

*Armstrong v. Michaels Stores, Inc.*,
59 F.4th 1011 (9th Cir. 2023) ...........................................................................24

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007).............................................................................................10

*Belozerov v. Gannett Co., Inc.*,
2022 WL 17832185 (D. Mass. Dec. 20, 2022)........................................ *passim*

*Berkson v. Gogo LLC*,
97 F. Supp. 3d 359 (E.D.N.Y. 2015) (Weinstein, J.)................................ *passim*

*Berman v. Freedom Financial Network, LLC*,
30 F.4th 849 (9th Cir. 2022) ..............................................................................25

*Byars v. The Goodyear Tire and Rubber Co.*,
2023 WL 1788553 (C.D. Cal. Feb. 3, 2023), ..................................................24

*Cappello v. Walmart Inc.*,
2019 WL 11687705 (N.D. Cal. Apr. 5, 2019).....................................................2

*Carter v. Scripps Networks, LLC*,
2023 WL 3061858 (S.D.N.Y. Apr. 24, 2023) ...........................................4, 5, 8

*Connecticut Nat'l Bank v. Germain*,
503 U.S. 249 (1992)...............................................................................................4

*Czarnionka v. The Epoch Times Ass'n, Inc.*,
2022 WL 17069810 (S.D.N.Y. Nov. 17, 2022).................................. 1, 2, 10, 11

*Eichenberger v. ESPN, Inc.*,
876 F.3d 979 (9th Cir. 2017) .........................................................................10, 11

*Ellis v. Cartoon Network, Inc.*,
803 F.3d 1251 (11th Cir. 2015) ....................................................................5, 7

*Feldman v. Star Tribune Media Company LLC*,
2023 WL 2388381 (D. Minn. Mar. 7, 2023) ...............................................10, 11

*Fteja v. Facebook, Inc.*,
841 F. Supp. 2d 829 (S.D.N.Y. 2012) ..............................................................16

*Hernandez v. Williams, Zinman & Parham PC*,
829 F.3d 1068 (9th Cir. 2016) .....................................................................4, 5, 8

*In re Facebook, Inc., Consumer Privacy User Profile Litig.*,
402 F. Supp. 3d 767 (N.D. Cal. 2019)............................................................2, 9

*In re Hulu Privacy Litig.*,
2012 WL 3282960 (N.D. Cal. Aug. 10, 2012) (Beeler, Mag. J.) ................1, 2, 5

*In re Hulu Privacy Litig.*,
2014 WL 1724344 (N.D. Cal. Apr. 28, 2014).........................................9, 10, 11

*In re Vizio, Inc. Consumer Privacy Litig.*,
238 F. Supp. 3d 1204 (C.D. Cal. 2017) ..............................................................1

*Jefferson v. Healthline Media, Inc.*,
2023 WL 3668522 (N.D. Cal. May 24, 2023)..................................................8, 9

*Lebakken v. WebMD, LLC*,
2022 WL 16716151 (N.D. Ga. Nov. 4, 2022) ........................................... *passim*

*Lopez v. Smith*,
203 F.3d 1122 (9th Cir. 2000) .........................................................................13

*Louth v. NFL Enterprises LLC*,
2022 WL 4130866 (D.R.I. Sept. 12, 2022) .....................................................1, 2

*Morgan v. Sundance, Inc.*,
142 S. Ct. 1708 (2022)......................................................................................24

*Newirth ex rel. Newirth v. Aegis Senior Cmtys., LLC*,
931 F.3d 935 (9th Cir. 2019) ...........................................................................24

*Nguyen v. Barnes & Noble Inc.*,
763 F.3d 1171 (9th Cir. 2014) ................................................................... *passim*

*PDC Labs., Inc. v. Hach Co.*,
2009 WL 2605270 (C.D. Ill. Aug. 25, 2009) ....................20, 21

*Peng v. Uber Techs., Inc.*,
237 F. Supp. 3d 36 (E.D.N.Y. 2017) ....................17

*Stark v. Patreon, Inc.*,
- F. Supp. 3d -, 2022 WL 7652166, at *7 (N.D. Cal. Oct. 13, 2022) .......3, 10, 11

*Starke v. Squaretrade, Inc.*,
2017 WL 3328236 (E.D.N.Y. Aug. 3, 2017) ....................15

*Starke v. SquareTrade, Inc.*,
913 F.3d 279 (2d Cir. 2019)....................23

*White v. Samsung Electronics America, Inc.*,
61 F.4th 334 (3d Cir. 2023) ....................24, 25

*Wilson v. Huuuge, Inc.*,
944 F.3d 1212 (9th Cir. 2019) ....................23, 25

*Yershov v. Gannett Satellite Info. Network, Inc.*,
104 F. Supp. 3d 135 (D. Mass. 2015), *rev'd*, 820 F.3d 482 (1st Cir. 2016) ....................7

*Yershov v. Gannett Satellite Info Network, Inc.*,
820 F.2d 482 (1st Cir. 2016) .................... *passim*

**California Cases**

*Long v. Provide Commerce, Inc.*,
245 Cal. App. 4th 855 (2016) .................... *passim*

*Sellers v. Just Answer LLC*,
73 Cal. App. 5th 444 (2021) .................... *passim*

**Federal Statutes**

18 U.S.C.
§ 2710(a)(1)....................3, 4, 5
§ 2710(a)(3)....................9
§ 2710(a)(4)....................1, 3
§ 2710(b) ....................11
VPPA .................... *passim*

**Federal Rules**

Rules of Civil Procedure
Rule 12(b)(1) ........ 24, 25
Rule 12(b)(6) ........ 10, 25
Rule 15(a)(2) ........ 13

**Other Authorities**

American Heritage Dictionary 1726 (4th ed. 2000) ........ 6

S. Rep. 100-599 (1988), *reprinted in* 1988 U.S.C.C.A.N. 4342-1; 1988 WL 243503, at *12) ........ 1

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. ARGUMENT

### A. The FAC Sufficiently Pleads a Non-Frivolous VPPA Claim.

#### 1. Defendant Is a "Video Tape Service Provider" Under the VPPA.

The First Amended Complaint ("FAC") plausibly alleges that Defendant is a "video tape service provider" under the VPPA. First, the VPPA defines "video tape service provider" to mean "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, ***or delivery of*** prerecorded video cassette tapes ***or similar audio visual materials*** …." 18 U.S.C. § 2710(a)(4) (emphasis added). Thus, the plain language of the VPPA is not limited to the sale or rental of "prerecorded video cassette tapes." Indeed, multiple federal courts have recognized that the VPPA's legislative history recognized "'Congress' intent to cover new technologies for pre-recorded video content.'" *Louth v. NFL Enterprises LLC*, 2022 WL 4130866, at *4 (D.R.I. Sept. 12, 2022) (quoting *In re Hulu Privacy Litig.*, 2012 WL 3282960, at *6 (N.D. Cal. Aug. 10, 2012) (Beeler, Mag. J.) ("The court concludes that Congress used 'similar audio visual materials' to ensure that VP[P]A's protections would retain their force even as technologies evolve.") (quoting S. Rep. 100–599 (1988), *reprinted in* 1988 U.S.C.C.A.N. 4342-1; 1988 WL 243503, at *12) (discussing "similar audio visual materials, such as laser discs, open-reel movies, or CDI technology")). Courts have recognized that "Congress's use of the phrase 'similar audiovisual materials' indicates that ***the definition is medium-neutral***; the defendant must be in the business of delivering video content, ***but that content need not be in a particular format***." *In re Vizio, Inc. Consumer Privacy Litig.*, 238 F. Supp. 3d 1204, 1221 (C.D. Cal. 2017) (emphasis added).

Second, numerous federal courts have interpreted the term, "video tape service provider," as including commercial website owners/operators. *See, e.g.*, *Belozerov v. Gannett Co., Inc.*, 2022 WL 17832185, at *3 (D. Mass. Dec. 20, 2022); *Czarnionka v. The Epoch Times Ass'n, Inc.*, 2022 WL 17069810, at *4 (S.D.N.Y. Nov. 17, 2022) (noting complaint's allegation that owner/operator of theepochtimes.com delivers audiovisual

materials including "news programs, television shows, documentaries, movies, and other audiovisual content"); *Lebakken v. WebMD, LLC*, 2022 WL 16716151, at *1, *3 & n.2 (N.D. Ga. Nov. 4, 2022) (noting allegation that owner/operator of WebMD.com provides "online health information and medical news"); *Ambrose v. Boston Globe Media Partners LLC*, 2022 WL 4329373, at *2 (D. Mass. Sept. 19, 2022) (noting allegation that bostonglobe.com "is engaged in the business of delivering various types of video content"); *Louth*, 2022 WL 4130866, at *4 (denying motion to dismiss as to pre-recorded content on NFL mobile application); *In re Facebook, Inc., Consumer Privacy User Profile Litig.*, 402 F. Supp. 3d 767, 798-99 (N.D. Cal. 2019) (denying motion to dismiss regarding Facebook's website); *Cappello v. Walmart Inc.*, 2019 WL 11687705, at *2 (N.D. Cal. Apr. 5, 2019) (denying motion to dismiss regarding walmart.com); *Yershov v. Gannett Satellite Info Network, Inc.*, 820 F.2d 482, 485 n.2 (1st Cir. 2016) (noting that defendant operator of USA Today Mobile App failed to challenge sufficiency of complaint alleging it to be a "video tape service provider"); *In re Hulu Privacy Litig.*, 2012 WL 3282960 at *6 (rejecting argument that VPPA does not cover streaming service purportedly because VPPA does not expressly cover digital distribution).

Such decisions should be treated as persuasive based on their reasoning. Defendant is "engaged in the business of delivering computer files containing video content, which are 'similar audio visual materials' to prerecorded cassette tapes." *Belozerov*, 2022 WL 17832185, at *3; (*see* FAC ¶ 63). That suffices. Notably, Defendant's Memorandum omits addressing *Belozerov*, which speaks volumes.

Although Defendant contends that a company like itself, a clothing retailer, (Def.'s Mem. at 7:10), should not be viewed as a "video tape service provider" because its core function is not to sell, rent, or deliver audio visual materials, *id.* at 7:10-12, the VPPA's language does not exclude such provider. There is nothing in the plain language of the VPPA statute imposing a "primary function" limitation or limiting the definition to a business engaged in a media business or actually selling or renting video media.

Additionally, *Stark v. Patreon, Inc.*, - F. Supp. 3d -, 2022 WL 7652166, at *7 (N.D. Cal. Oct. 13, 2022), supports Plaintiff's position because the court noted:

> "***[I]t is reasonable to think that developing a website to deliver video content requires more significant 'tailor[ing] to serve that purpose' than a package delivery service shipping videocassettes along with other physical goods***. *See id.* at 1221. That third-party 'creators' may also be involved in developing and delivering the videos at issue does not absolve Patreon of liability—'a defendant can be 'engaged in the business' of delivering video content even if other actors also take part in the delivery of the same video content.' *Id.* Nothing in Patreon's terms of use or other policies offered for judicial notice dispels the inference that Patreon 'delivers' videos through its platform, even if those videos are created by third parties."

*Stark*, 2022 WL 7652166, at *7 (emphasis added). Thus, *Stark* supports Plaintiff's position that developing a website to deliver video content requires far more "tailoring" to serve that purpose than a letter carrier shipping video cassettes or DVDs and other physical goods to consumers.

Finally, Defendant's dire prediction that Plaintiff's interpretation of a "video tape service provider" defines such term too broadly such that it would apply the VPPA to any website where a consumer can watch an embedded video clip, (Def.'s Mem. at 7:25-27), is wrong. For example, website owners/operators with no commercial interest (such as a non-profit entity) are clearly beyond the scope of the VPPA. That is why the VPPA has defined the "video tape service provider" to "any person, engaged in the business, in or affecting ***interstate or foreign commerce***," as part of its definition. 18 U.S.C. § 2710(a)(4) (emphasis added).

**2. Plaintiff Is a "Consumer" as Defined by the VPPA.**

The VPPA defines the term "consumer" to mean "any renter, ***purchaser***, or ***subscriber*** of goods or services from a video tape service provider." 18 U.S.C. § 2710(a)(1) (emphasis added).

**a. The FAC Plausibly Alleges that Plaintiff Is a "Purchaser".**

The FAC alleges that Plaintiff "is a 'purchaser' of goods from Defendant in the past." (FAC ¶ 32.) This allegation suffices to make Plaintiff a "purchaser" of "goods"

or "services" from a "video tape service provider." 18 U.S.C. § 2710(a)(1). Notably, the VPPA does not define the meaning of the term, "purchaser."

Defendant's contention that Plaintiff is not a "purchaser" within the meaning of the VPPA is without merit. The VPPA does not define or restrict the meaning of the term, "purchaser," to a person who buys any goods or services by a particular method or location. Nor does the VPPA define or limit such term to a person why buys any goods or services ***constituting audio visual materials***. Instead, such term is undefined and unlimited. "As a 'broad remedial statute,' the [VPPA] must be liberally construed in favor of the consumer in order to effectuate this goal of eliminating abuse." *Hernandez v. Williams, Zinman & Parham PC*, 829 F.3d 1068, 1078-79 (9th Cir. 2016) (internal citation omitted). "[T]he phrase 'goods or services' is generally construed broadly to encompass 'all parts of the economic output of society.'" *Lebakken*, 2022 WL 16716151, at *3. The Court should reject Defendant's attempt to read into the VPPA's plain language an interpretation that is unsupported.

Defendant's reliance upon *Carter v. Scripps Networks, LLC*, 2023 WL 3061858 (S.D.N.Y. Apr. 24, 2023), is misplaced because it is unpersuasive for several reasons. First, *Carter* ignores the well-established rule that a plain meaning analysis applies to statutory interpretation if there is no ambiguity in the statutory language. *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 254 (1992) ("When the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.'") (citation omitted). Simply put, the statutory text is clear that the VPPA defines the term "consumer" to mean "any renter, ***purchaser***, or subscriber of goods or services from a video tape service provider." 18 U.S.C. § 2710(a)(1) (emphasis added). The VPPA does not define or restrict the meaning of the term, "purchaser," to a person who buys any goods or services ***constituting audio visual materials***. Nor does the VPPA define or restrict the term "subscriber" to mean "subscribers to audio visual materials," as held in *Carter*. 2023 WL 3061858, at *6.

As mentioned above, "[T]he phrase 'goods or services' is generally construed

broadly to encompass 'all parts of the economic output of society.'" *Lebakken*, 2022 WL 16716151, at *3. Indeed, *Carter* itself acknowledges, "The statute does not limit or qualify 'goods or services' to video materials." *Carter*, 2023 WL 3061858, at *5. Given the foregoing acknowledgment in *Carter*, its resort to a statutory interpretation going beyond the plain meaning of the statutory language was improper.

Second, *Carter* erred by failing to liberally construe the VPPA, whose purpose is to protect the privacy rights of individuals. *Hernandez*, 829 F.3d at 1078-79.

Third, *Carter* is distinguishable because the plaintiffs therein did not allege that they were a "purchaser" of "goods or services from a video tape service provider." 18 U.S.C. § 2710(a)(1). The complaint in *Carter* merely alleged that the plaintiffs were "consumers" "because they subscribed to HGTV's newsletter." *Id.* at *2. *Carter* noted, "There is no suggestion that plaintiffs purchased or rented a covered good or service from HGTV." *Id.* at *4. Thus, *Carter*'s analysis is limited to interpreting the term, "subscriber," in the VPPA statute, 18 U.S.C. § 2710(a)(1).

**b. The FAC Plausibly Alleges that Plaintiff Is a "Subscriber".**

The FAC alleges that "Plaintiff subscribes to Defendant's marketing e-newsletter." (FAC ¶ 32.) This allegation suffices to make Plaintiff a "subscriber" of "services" from a "video tape service provider." 18 U.S.C. § 2710(a)(1). Notably, the VPPA does not define the meaning of the term, "subscriber."

First, as explained by the Eleventh Circuit, "payment is not a necessary element of subscription." *Ellis v. Cartoon Network, Inc.*, 803 F.3d 1251, 1256 (11th Cir. 2015). "The term 'subscriber' is not preceded by the word 'paid' in § 2710(a)(1) of the VPPA, and there are numerous periodicals, newsletters, blogs, videos, and other services that a user can sign up for (i.e., subscribe to) and receive for free." *Ellis*, 803 F.3d at 1256 (citing *In re Hulu Privacy Litig.*, 2012 WL 3282960, at *8). Multiple federal courts besides the Eleventh Circuit in *Ellis* have recognized that monetary payment for using a website is not viewed as required to satisfy the "consumer" element of the VPPA. *Belozerov*, 2022 WL 17832185, at *3 (citing *Yershov* as "declin[ing] to interpret the

[VPPA] as incorporating monetary payment as a necessary element"); *Yershov*, 820 F.3d at 487 ("Congress would have had no need to include a third category of persons protected under the Act [besides "renter" and "purchaser"] if it had intended that only persons who pay money for videos be protected, which militates against an interpretation of the statute incorporating such an element."); *id.* at 488 ("we … decline to interpret the statute as incorporating monetary payment as a necessary element"). Thus, Defendant's argument that its website at https://www.bodenusa.com (the "Website") is "free," (Def.'s Mem. at 6:22), is not dispositive of the "subscriber" meaning.

Second, the Court should follow the First Circuit's persuasive decision in *Yershov*, 820 F.3d at 487. In *Yershov*, the First Circuit squarely addressed the question whether the complaint adequately alleged facts plausibly establishing whether an individual is a "consumer" in relation to the defendant, the latter of which was the operator of USA Today Mobile App. *Id.* at 487. Notably, the First Circuit relied upon a dictionary definition that was "[m]ore on point technologically" than other dictionary definitions because it "defines 'subscribe' as '[t]o receive or be allowed to access electronic texts or services by subscription' with 'subscription' defined, in turn, to include '[a]n agreement to receive or be given access to electronic texts or services.'" *Id.* at 487 (quoting The American Heritage Dictionary 1726 (4th ed. 2000)). The First Circuit then applied such definition to the alleged facts:

> "This is just what we have here: [Defendant] offered and [Plaintiff] accepted [Defendant's proprietary mobile device application as a tool for directly receiving access to [Defendant's] electronic text and videos without going through other distribution channels, much like how a newspaper subscriber in 1988 could, if he wished, retrieve a copy of the paper in a box at the end of his driveway without having to go look for it at a store."

820 F.3d at 487. Although *Yershov* recognized that "there are other common definitions of the term 'subscribe' that include as an element a payment of some type and/or presume more than a one-shot transaction," 820 F.3d at 487, *Yershov* concluded that "***[p]laintiff's decision to download the App seems a fair enough indication that he intended more than a one-shot visit***." *Id.* (emphasis added).

Notably, *Yershov* comprehensively considered the Eleventh Circuit's decision in *Ellis* regarding the interpretation of "subscriber" in the VPPA, but disagreed with it. 820 F.3d at 488-89. *Ellis* relied upon and agreed with the district court decision in *Yershov v. Gannett Satellite Info. Network, Inc.*, 104 F. Supp. 3d 135 (D. Mass. 2015), *rev'd*, 820 F.3d 482 (1st Cir. 2016), the latter of which had held mere users of the USA Today mobile app were not "subscribers" within the VPPA's definition of consumer because subscriptions involve either "payment, registration, commitment, delivery [] or access to restricted content." *Yershov*, 104 F. Supp. 3d at 147-48; *Ellis*, 803 F.3d at 1256 ("We find [the district court decision in] *Yershov* persuasive and conclude it is the better reasoned of the existing opinions on the issue [interpreting the term 'subscriber' in the VPPA]."). The First Circuit explained why it disagreed with *Ellis* in relevant part as follows:

> "We would describe the allegations (and their reasonable inferences) in this case quite differently. To use the App, ***[Plaintiff] did indeed have to provide [Defendant] with personal information***, such as his Android ID … at the time he viewed a video, … linked to his viewing selections. ***While he paid no money, access was not free of a commitment to provide consideration in the form of that information, which was of value to [Defendant]***. And by installing the App on his phone**, thereby establishing seamless access to an electronic version of USA Today, [Plaintiff] established a relationship with [Defendant] that is materially different from what would have been the case had *USA Today* simply remained one of millions of sites on the web that [Plaintiff] might have accessed through a web browser**.
>
> *Ellis*, like the district court, also presumed that downloading a mobile device application 'is the equivalent of adding a particular web site to one's Internet browser as a favorite.' *Id.* at 1257. We do not think that such a presumption is so apparently true as to dictate our reading of the complaint, which concedes no such equivalence. Why, after all, did [Defendant] develop and seek to induce downloading of the App? And it is by no means self-evident that the version of USA Today one accesses with a browser is identical in all respects to the electronic version one accesses with the App.
>
> Our conclusion is further informed by positing a non-electronic version of the electronic relationship between [Plaintiff] and [Defendant]. Imagine that [Defendant] had installed a hotline at [Plaintiff's] home, for free, allowing him to call [Defendant] and receive instant delivery of videos in exchange for his name and address, and he then used the hotline over the course of many months to order videos. We doubt that Congress would have intended that [Defendant] would have been free in such a scenario to publish [Plaintiff's] PII by claiming that he was not a purchaser, renter, or subscriber. This physical world hypothetical is admittedly unrealistic, but only because installing a hotline is expensive in comparison to the value of obtaining [Plaintiff's] name and address. Here, by contrast, the marginal cost to [Defendant] of maintaining the App for [Plaintiff] and electronically allowing him to access its video content through it may well be less than the value

> to [Defendant] of having [Plaintiff] use the App and provide his PII. We see nothing in these differences, though, to find [Plaintiff] to be a subscriber in one scenario and not the other."

*Yershov*, 820 F.3d at 489 (emphasis added). *Yershov* then held that "the transaction described in the complaint--whereby [plaintiff] used the mobile device application that [defendant] provided to him, which gave [defendant] [plaintiff's] device identifier, and the titles of the videos he viewed in return for access to [defendant's] video content--plausibly pleads a case that the VPPA's prohibition on disclosure applies." *Id.* Notably, Defendant has made no attempt to address or distinguish *Yershov* at all.

In addition, Defendant makes no attempt to distinguish, let alone, address *Belozerov*, 2022 WL 17832185, at *3 (citing *Yershov* as "declin[ing] to interpret the [VPPA] as incorporating monetary payment as a necessary element"). *Belozerov* is directly on point. Defendant's omission speaks volumes.

Furthermore, the VPPA does not define or restrict the meaning of the term, "subscriber," to a person who subscribes to services by a particular method or location. Nor does the VPPA define or limit such term to a person who subscribes to any services ***constituting audio visual materials***. Instead, such term is undefined and unlimited. "As a 'broad remedial statute,' the [VPPA] must be liberally construed in favor of the consumer in order to effectuate this goal of eliminating abuse." *Hernandez*, 829 F.3d at 1078-79 (internal citation omitted). "[T]he phrase 'goods or services' is generally construed broadly to encompass 'all parts of the economic output of society.'" *Lebakken*, 2022 WL 16716151, at *3. The Court should reject Defendant's attempt to read into the VPPA's plain language an interpretation that is unsupported.

Defendant's reliance upon *Carter* is misplaced because it made no attempt to interpret the "subscriber" term in the VPPA broadly in furtherance of Congress's goal to protect the privacy rights of individuals. Instead, *Carter*'s extremely narrow interpretation of a "subscriber" surely frustrates the privacy-related goal underlying the VPPA's enactment.

Finally, Defendant's reliance upon *Jefferson v. Healthline Media, Inc.*, 2023 WL

3668522, at *3 (N.D. Cal. May 24, 2023), is misplaced. In *Jefferson*, the plaintiff alleged that she "subscribes to Healthline's email list" and provided the defendant with her "name and email address when subscribing to its services." *Id.* at *1. Although the district court dismissed the plaintiff's VPPA claim for failing to plausibly allege a VPPA claim, the court's precise reasoning was limited to the fact that "no information is provided about this [email] list." *Id.* at *3. "The Court cannot discern or infer from the complaint whether [plaintiff] receives ***any kind of publication***, let alone any good or service, in exchange for signing up for [Defendant's] email list." *Id.* (emphasis added). The court then dismissed the complaint "with leave to amend." *Id.* Thus, *Jefferson* can and should be viewed as limited to its unique fact pattern in which the court was uncertain whether the plaintiff therein received "any kind of publication" in exchange for signing up for the defendant's email list. Here, in contrast, the FAC alleges that "Plaintiff subscribes to Defendant's marketing e-newsletter." (FAC ¶ 32.) Thus, the factual allegations supporting Plaintiff's status as a subscriber to Defendant's publication is far more clear in the instant action than the circumstances at issue in *Jefferson*. Thus, *Jefferson* does not support Defendant's position here.[1]

**3. The FAC Sufficiently Alleges Defendant's Disclosure of Plaintiff's Personally Identifiable Information to Facebook and Defendant's Knowledge of Such Disclosures.**

The VPPA "broadly" defines the term "personally identifiable information" as including "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." *In re Facebook, Inc., Consumer Privacy User Profile Litig.*, 402 F. Supp. 3d at 798 (citing 18 U.S.C. § 2710(a)(3)). "The statute does not require an actual name and requires only something akin to it." *In re Hulu Privacy Litig.*, 2014 WL 1724344, at *14 (N.D. Cal. Apr. 28, 2014).

[1] In *Jefferson*, the plaintiff did not allege that she was a "purchaser" of the defendant's goods or services. *Jefferson*, 2023 WL 3668522, at *2. Thus, *Jefferson* has no application to the issue of what constitutes a "purchaser" within the meaning of the VPPA.

As the Ninth Circuit has put it, personal identifiable information ("PII") is "information that would readily permit an ordinary person to identify a specific individual's video-watching behavior." *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 985 (9th Cir. 2017).

**a. The FAC's Allegations that Defendant Knowingly Disclosed Plaintiff's PII to Facebook Is Plausible.**

The FAC sufficiently alleges Defendant's disclosure of Plaintiff's PII to Facebook and Defendant's knowledge of such disclosures. (FAC ¶¶ 12-37.) The FAC sufficiently alleges that Defendant has disclosed Plaintiff obtaining specific video materials from the Website via the Facebook Tracking Pixel. *Id.* The Court is required to take as true the foregoing allegations for purposes of the instant Motion. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007) ("Rule 12(b)(6) does not countenance ... dismissals based on a judge's disbelief of a complaint's factual allegations") (citation omitted).

The FAC alleges that by embedding the Facebook Tracking Pixel's code onto the Website, Defendant compels a user's browser to send numerous cookies to Facebook, (FAC ¶¶ 24-31), which includes the "c_user cookie," which "contains that visitor's unencrypted Facebook ID." *Id.* ¶ 20. This is how Facebook is able to identify a website visitor's video watching behavior.

Indeed, multiple federal courts have recognized as plausible the allegation that the Facebook ID itself constitutes PII. *Feldman v. Star Tribune Media Company LLC*, 2023 WL 2388381, at *8-*10 (D. Minn. Mar. 7, 2023); *Belozerov*, 2022 WL 17832185, at *3 ("A Facebook ID meets the broad definition of PII in this circuit") ("A Facebook ID is a unique identifier that allows anyone to discover the user's identity."); *Czarnionka*, 2 022 WL 17069810, at *4; *Lebakken*, 2022 WL 16716151, at *4; *Stark*, 2022 WL 7652166, at *7-*8; *Ambrose*, 2022 WL 4329373, at *2; *In re Hulu Privacy Litig.*, 2014 WL 1724344, at *14 ("The Facebook User ID is more than a unique, anonymous identifier. ***It personally identifies a Facebook user***. That it is a string of numbers and letters does not alter the conclusion. Code is a language, and languages contain names, and the string is the Facebook user name.") (emphasis added) (finding a material issue of fact that the

information transmitted to Facebook was sufficient to identify individual consumers). The Court should follow such decisions.

Indeed, although the Ninth Circuit applies the ordinary person test, *Eichenberger*, 876 F.3d at 985, the Ninth Circuit noted that a "Facebook link … may very well readily enable an 'ordinary person' to identify an individual." 876 F.3d at 986, *quoted in Stark*, 2022 WL 7652166, at *7. Notably, Defendant has conveniently omitted this portion of *Eichenberger* from its Memorandum despite citing *Eichenberger* for other propositions. (Def.'s Mem. at 1:20-22; 8:23-25; 11:8; 11:19; 12:15; 12:17.)

Furthermore, the above-mentioned decisions that recognize that a Facebook ID constitutes PII similarly recognize as plausible the allegation that a defendant website operator programmed the Facebook Pixel into its website code satisfies the "knowingly discloses" element of VPPA in 18 U.S.C. § 2710(b). *Feldman*, 2023 WL 2388381, at *10; *Belozerov*, 2022 WL 17832185, at *4; *Czarnionka*, 2022 WL 17069810, at *4; *Lebakken*, 2022 WL 16716151, at *4-*5; *Stark*, 2022 WL 7652166, at *7-*8; *Ambrose*, 2022 WL 4329373, at *2. "By installing the Pixel, Defendant opened a digital door and invited Facebook to enter that door and extract information from within." *Czarnionka*, 2022 WL 17069810, at *3. "[A]rguing that transmitting cookies is just the normal way that webpages … load is not enough to negate knowledge or show the absence of evidence about knowledge." *In re Hulu Privacy Litig.*, 2014 WL 1724344, at *16.

Defendant deliberately integrated the Facebook Tracking Pixel's software code into its Website. (FAC ¶ 15.) ***Defendant makes no attempt to argue otherwise in the instant Motion***. Such omission speaks volumes. Defendant's analysis ignores the foregoing case authority and the FAC's factual allegations showing that Defendant intentionally allowed its Website to host the Facebook Tracking Pixel for advertising purposes. (FAC at 2:2-5.)

**b. The Figures in the FAC Are Purely for Illustrative Purposes Only.**

In direct response to an argument in Defendant's Motion to Dismiss the original

Complaint, which implied that the c_user account reflected in Figure 6 in the Complaint was intended to reflect Plaintiff's Facebook ID, Plaintiff filed the FAC to clarify that this was not Plaintiff's intent at all. Instead, the FAC clarified that the c_user account reflected in Figure 6 was merely the Facebook ID of an account created by Plaintiff's expert. In particular, paragraph 20 alleged in relevant part as follows:

> "The c_user account set forth above in Figure 6 depicts Plaintiff's expert's Facebook ID. Thus, Defendant's assumption that the c_user value set forth in Figure 6, i.e., 100090226609015, is of Plaintiff's Facebook ID is mistaken."

(FAC ¶ 20.) Instead of recognizing Figure 6 for what it is, an attempt to illustrate the fact that it is possible to discern values of cookies that Defendant compels a web browser to send, Defendant tries to twist the import of Figure 6 by claiming that the Facebook ID depicted in Figure 6 "refers to a fake Facebook account". (Def.'s Mem. at 10:24.) Defendant is making much ado about nothing.

**B. The Declaration of Peter Brann Proves Nothing.**

Although Defendant relies upon the Declaration of Peter Brann, (Doc. 15-2), in support of the instant Motion,[2] the Brann Declaration, which is a declaration of Defendant's lead counsel, does not satisfy Defendant's initial evidentiary burden of showing the lack of any genuine issues of material fact when such Declaration is viewed in the light most favorable to the nonmoving party, *i.e.*, Plaintiff.

First, although Brann avers that he entered the Facebook ID reflected in Figure 6 of the FAC into a browser, (Brann Decl. ¶¶ 4-6), Plaintiff has expressly clarified in paragraph 20 of the FAC that the Facebook ID reflected in Figure 6 belongs to Plaintiff's expert, and is not intended to reflect Plaintiff's Facebook ID. (FAC ¶ 20) (Ferrell Decl. ¶ 8.) Plaintiff's explanation is completely reasonable. Defendant's attempt to twist it into something nefarious is absurd.

Second, Brann's purported investigation of a particular cookie known as the "_fbp cookie," (Brann Decl. ¶ 7), raises more questions than answers any of them. The actual

[2] It is worth noting that Defendant did not rely upon any declaration of Brann in support of its Motion to Dismiss the initial Complaint. (*See* Doc. 12.)

cookie name alleged in paragraph 23 of the FAC is _fbp cookie, but paragraph 7 of the Brann Declaration is completely silent about such cookie name. This begs the question: Did Brann investigate Facebook regarding such cookie name? Notably, footnote 16 of the FAC expressly includes a hyperlink to a Facebook webpage addressing the _fbp cookie. Did Brann review such hyperlinked webpage before signing his Declaration? If so, does it change his understanding of what a _fbp cookie contains, *i.e.*, "an unencrypted value that uniquely identifies a browser"? (FAC ¶ 23.)

Although Brann seems to express confusion about the value, fb.1.16796810846, detected by Plaintiff's expert from the _fbp cookie from Defendant's Website, (Brann Decl. ¶ 7), Brann's averment proves nothing, and, in any event, clearly lacks foundation. There is nothing to indicate that Brann is technically proficient to be able to offer any averments about the _fbp cookie and the fact that Facebook uses the _fbp cookie to identify users of Defendant's Website via the Facebook Tracking Pixel.

**C. If a Curable Defect Remains, Leave to Amend Should Be Granted.**

If the Court is inclined to grant the instant Motion due to a curable pleading deficiency, this Court can and should grant Plaintiffs leave to amend. *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000); Fed. R. Civ. P. Rule 15(a)(2).

**D. The Arbitration Clause Is Unenforceable Due to Lack of Actual Notice to Plaintiff.**

Defendant relies upon the hyperlink at the bottom of its various webpages named "Terms & Conditions." (Def.'s Mem. at 13:18.) The record is ***undisputed***, however, that Plaintiff lacked actual notice of the Terms & Conditions on the Website at the time that her claim accrued. Specifically, Plaintiff was unaware of any Terms & Conditions applicable to her use of the Website either prior to or during such usage. (Rodriguez Decl. ¶ 3.) Plaintiff never saw the Terms & Conditions because she never clicked on any hyperlink[3] containing such terms. *Id.* During her visit to the Website, Plaintiff did not

[3] "In the computing world, a hyperlink is a word, phrase, or image—typically underlined or ***in blue font***—that the user can click on to jump to a new document or a new section

Continued on the next page

anticipate that she would enter into an ongoing relationship with Defendant governed by extensive contractual terms. *Id.* It is undisputed that if a user does not click on that hyperlink, then the Terms & Conditions do not become visible to the user on the computer screen.

Here, Defendant's Terms & Conditions do not come close to constituting a "clickwrap" agreement "in which website users are required to click on an 'I agree' box after being presented with a list of terms and conditions of use . . . ." *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175-76 (9th Cir. 2014).

Although "courts have consistently enforced . . . agreements where the user had ***actual notice*** of the agreement," *id.* at 1176 (emphasis added), no such evidence of any actual notice exists here. (Rodriguez Decl. ¶ 3.) "[W]here, as here, there is no evidence that the website user had actual knowledge of the agreement, the validity of the . . . agreement turns on whether the website puts a reasonably prudent user on inquiry notice of the terms of the contract." *Nguyen*, 763 F.3d at 1177.

**E. The "Terms & Conditions" Hyperlink Buried at the Bottom of Footer of Each Webpage Is Insufficient Under Ninth Circuit Case Law to Amount to Constructive Notice.**

Where there is no evidence that plaintiff had actual knowledge of purported terms of use, their enforceability "turns on whether the [website] puts a reasonably prudent user on inquiry notice of the terms of the contract." *Nguyen*, 763 F.3d at 1177. To determine that, courts apply four factors:

> "(1) Aside from clicking the equivalent of sign-in (e.g., log-in, buy-now, purchase, etc.), ***is there substantial evidence from the website that the user was aware that she was binding herself to more than an offer of services or goods in exchange for money?*** If not, the "terms of use," such as those dealing with venue and arbitration, should not be enforced against the purchaser.
>
> (2) Did the design and content of the website, including the homepage, make the "terms of use" (i.e., the contract details) ***readily and obviously available to the user?*** If not, the "terms of use," such as those dealing with venue and arbitration, should not be enforced against the purchaser.
>
> (3) ***Was the importance of the details of the contract obscured or minimized***

---

within the current document." *Sellers v. Just Answer LLC*, 73 Cal. App. 5th 444, 452 n.2 (2021) (emphasis added).

> ***by the physical manifestation of assent expected of a consumer seeking to purchase or subscribe to a service or product?*** If yes, then the "terms of use," such as those dealing with venue and arbitration, should not be enforced against the purchaser.
>
> (4) Did the merchant ***clearly draw the consumer's attention to material terms that would alter what a reasonable consumer would understand to be her default rights when initiating an online consumer transaction from the consumer's state of residence***: The right to (a) not have a payment source charged without notice (i.e., automatic payment renewal); (b) ***bring a civil consumer protection action under the law of her state of residence and in the courts in her state of residence***; and (c) participate in a class or collective action? If not, then (a), (b), or (c) should not be enforced against the consumer."

*Berkson v. Gogo LLC*, 97 F. Supp. 3d 359, 402 (E.D.N.Y. 2015) (Weinstein, J.) (emphasis added). "The *Berkson* test has been favorably cited and applied by federal and state trial courts." *Starke v. Squaretrade, Inc.*, 2017 WL 3328236, at *6 (E.D.N.Y. Aug. 3, 2017).

Here, all four of the *Berkson* factors argue against enforcement of the Terms & Conditions because the Website failed to provide constructive notice of the Terms & Conditions as well as the arbitration clause provision contained therein – in fact, the terms here are much more inconspicuous than the terms in *Nguyen*. Defendant has failed to present any evidence that Plaintiff had a sufficient opportunity to read the Terms & Conditions and its arbitration clause and assented to the agreement through an ***unambiguous*** method provided by Defendant.

**1. There Is No Evidence that Plaintiff Was Aware that She Was Binding Herself to Defendant's Terms & Conditions Merely By Using the Website.**

Defendant has offered no evidence supporting the proposition that Plaintiff knew or should have known that she was binding herself to Defendant's Terms & Conditions merely by using the Website. Indeed, as mentioned above, Plaintiff never saw the Terms & Conditions because she never clicked on any hyperlink containing such terms. (Rodriguez Decl. ¶ 3.)

**2. The Design and Content of the Website Did Not Make the Terms & Conditions Readily and Obviously Available to the User.**

Contrary to Defendant's assumption, the design and content of the Website did not make the Terms & Conditions readily and obviously available to the user for many

reasons.

As a preliminary matter, courts have relied upon various criteria to find electronic contracts enforceable based upon a website's textual notices to users. For example, the Ninth Circuit in *Nguyen* discussed "placement," color, and contrast of hyperlinks (*i.e.*, "color-contrasting text") and "the website's general design." *Nguyen*, 763 F.3d at 1177-78. Similarly, *Long v. Provide Commerce, Inc.*, 245 Cal. App. 4th 855 (2016), relied upon the "placement, color, size and other qualities [of the terms of service hyperlinks] relative to the . . . [website's] overall design". *Id.* at 866. "Federal courts relying on *Long* and *Nguyen* have generally considered similar criteria when determining whether a textual notice is sufficiently conspicuous under California law. These criteria include: 1) the size of the text; 2) the color of the text as compared to the background it appears against; 3) the location of the text and, specifically, its proximity to any box or button the user must click to continue use of the website; 4) the obviousness of any associated hyperlink; and 5) whether other elements on the screen clutter or otherwise obscure the textual notice." *Sellers*, 73 Cal. App. 5th at 473 (citing cases). "[T]he criteria are largely subjective."[4] *Id.*

**c. There Is No Mechanism that Forces the User to Actually Examine Defendant's Terms & Conditions.**

There is no "mechanism that forces the user to actually examine the terms before assenting." *Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829, 837-38 (S.D.N.Y. 2012) (holding that Facebook's Terms of Use are not a "pure-form" clickwrap agreement because there is no "mechanism that forces the user to actually examine the terms before assenting"); *Berkson*, 97 F. Supp. 3d at 404 ("***He was not required to scroll through the contract of adhesion and its boilerplate terms in order to click 'accept' or 'I agree.'***") (emphasis added). The Terms & Conditions were not set out in a scrollable format. Instead, a subtle hyperlink was used. (Ferrell Decl. ¶¶ 2-7 & Ex. 1; *see also* Foley Decl.

[4] "[T]he relevant criteria" that federal courts have "applied to evaluate conspicuousness is largely subjective." *Sellers*, 73 Cal. App. 5th at 481. Although the issue of conspicuousness is "typically characterized as a question of law," *Sellers* correctly recognized that courts are "actually conducting" "a fact-intensive inquiry" and making a largely "subjective" analysis, resulting in "seemingly inconsistent results." *Id.* at 473.

Ex. B; Doc. 13-2; PageID.84; Pg. 2 of 2.)

**d. Defendant Failed to Design Its Website to Provide an Explicit Textual Notice or Admonition to Review Its Terms & Conditions.**

Defendant failed to draw Plaintiff's attention to the Terms & Conditions by using "signifiers of importance" such as the phrase "please read" or the word "important". *Peng v. Uber Techs., Inc.*, 237 F. Supp. 3d 36, 49 (E.D.N.Y. 2017) (stating that the offerees were "clearly and repeatedly encouraged to click on the contract containing the terms to which they were agreeing"). In *Nguyen*, the Ninth Circuit rejected the enforceability of an electronic contract of adhesion despite the existence of a conspicuous hyperlink in close proximity to relevant buttons users must click on. The Ninth Circuit held:

> "[W]e therefore hold that where a website makes its terms of use available via a conspicuous hyperlink . . . but otherwise provides no notice to users ***nor prompts them to take any affirmative action to demonstrate assent***, even close proximity of the hyperlink to relevant buttons users must click on—without more—is insufficient to give rise to constructive notice. . . . [T]he onus must be on website owners to put users on notice of the terms to which they wish to bind consumers. Given the breadth of the range of technological savvy of online purchasers, consumers cannot be expected to ferret out hyperlinks to terms and conditions ***to which they have no reason to suspect they will be bound***."

*Nguyen*, 763 F.3d at 1178-79 (emphasis added); *id.* at 1178 n.1 ("where courts have relied on the proximity of the hyperlink to enforce a browsewrap agreement, the websites at issue have also included ***something more*** to capture the user's attention and secure her assent") (emphasis added); *id.* at 1177-78 (referring to "explicit textual notice" to "*Review terms*" to determine existence of constructive/inquiry notice) (emphasis in original); *Long*, 245 Cal. App. 4th at 865 (citing footnote 1 of *Nguyen* for proposition that "something more" than a conspicuous hyperlink is necessary to give rise to constructive notice such as "an explicit textual notice warning users to ''Review terms''"); *Sellers*, 73 Cal. App. 5th at 468 (citing *Nguyen* and *Long*). It is undisputed that no such "explicit textual notice" or admonition to review Defendant's Terms & Conditions exists on Defendant's Website.

In *Sellers*, the California Court of Appeal focused on the providers' website design as follows:

> "In our view, it is more appropriate to focus on the providers, which have complete control over the design of their websites and can choose from myriad ways of presenting contractual terms to consumers online. These include clickwrap and scrollwrap agreements that eliminate any uncertainty as to the consumer's notice of contractual terms and assent to those very terms. We therefore agree with the courts in *Long* and *Nguyen* that ' 'the onus must be on website owners to put users on notice of the terms to which they wish to bind consumers. Given the *breadth of the range of technological savvy of online purchasers*, consumers cannot be expected to ferret out hyperlinks to terms and conditions to which they have no reason to suspect they will be bound.' ' "

*Sellers*, 73 Cal. App. 5th at 475-76 (emphasis in original) (quoting *Long*, 245 Cal. App. 4th at 867 (quoting *Nguyen*, 763 F.3d at 1179)); *Sellers*, 73 Cal. App. 5th at 481 ("Because website providers have full control over the design of their websites, the onus is on them to provide adequate notice of contractual terms, particularly where, as here, the consumer is not likely expecting to be bound by such terms."); *see also Berkson*, 97 F. Supp. 3d at 382 ("The offeror has thought through the problems with the aid of lawyers and other experts and is a 'repeat player.' ").

*Sellers* noted that it is particularly appropriate to focus on the seller's design of the website when the consumer does not expect to enter into an ongoing contractual relationship:

> "This is particularly true when the transaction is one in which the typical consumer would not expect to enter into an ongoing contractual relationship, regardless of whether the transaction occurs online or in person. As we have noted, ***it is questionable whether a consumer buying a single pair of socks, or signing up for a free trial, would expect to be bound by contractual terms, and a consumer that does not expect to be bound by contractual terms is less likely to be looking for them***."

*Sellers*, 73 Cal. App. 5th at 476 (emphasis added).

**e. Neither the "Terms & Conditions" Name for the Hyperlink at Issue Nor the Title of the Actual Hyperlinked Document Are Self-Defining.**

Notably, Defendant has failed to cite anything that indicates that a hyperlink named "Terms & Conditions" is self-defining to connote a contract or agreement in the mind of a reasonably prudent consumer.

In addition, the "Terms & Conditions of Use" title of the actual hyperlinked

document is not self-defining. "Despite conducting extensive research on the topic, the court in *Berkson* concluded there is very little empirical evidence regarding 'what the average internet user perceives to be the meaning of the phrase 'terms of use' or '***terms and conditions***,' or the degree to which he or she is aware that each time a purchase is conducted over the internet, a binding contract regarding more than just the promise to pay may be being entered into.'" *Sellers*, 73 Cal. App. 5th at 475 (quoting *Berkson*, 97 F. Supp. 3d at 380) (emphasis added). In *Sellers* , the noted:

> "In [the court's] view, the problem with merely displaying a hyperlink in a prominent or conspicuous place is that, without notifying consumers that the link page contains binding contractual terms, ***the phrase 'terms of use' may have no meaning or a different meaning to a large segment of the [i]nternet-using public***."

*Sellers*, 73 Cal. App. 5th at 469 (emphasis added) (quoting *Long*, 245 Cal. App. 4th at 867).

Both federal courts and California appellate courts have all recognized that "Terms of Service" is not self-defining to mean "contract" to reasonable consumers. *Applebaum v. Lyft, Inc.*, 263 F. Supp. 3d 454, 468 (S.D.N.Y. 2017); *Berkson*, 97 F. Supp. 3d at 380; *Long*, 245 Cal. App. 4th at 867 ("the phrase 'terms of use' may have no meaning or a different meaning to a large segment of the Internet-using public").

**f. The Hyperlink Is Subtle.**

The Terms & Conditions were made available to Website users via only a "subtle hyperlink". *Applebaum*, 263 F. Supp. 3d at 469. In particular, the hyperlink used was subtle because "there were no familiar indicia to inform consumers that there was in fact a hyperlink that should be clicked and that a contract should be reviewed, such as words to that effect," or "capitalization, italization, or large font." *Applebaum*, 263 F. Supp. 3d at 467; *Berkson*, 97 F. Supp. 3d at 404 ("***[t]he hyperlink to the "terms of use" was not in large font, all caps***") (emphasis added).

Although underlining was used by Defendant only if a user hovers over the "Terms & Conditions" hyperlink with a mouse, (Ferrell Decl. ¶ 5), that indicia was insufficient to make the "Terms & Conditions" hyperlink conspicuous because there was no color-

contrasting text to indicate the existence of the "Terms & Conditions" hyperlink to the Terms & Conditions of Use. In particular, the "Terms & Conditions" hyperlink and underlining are both in the color gray, (Ferrell Decl. ¶ 5), which is not color-contrasting at all. Indeed, the Ninth Circuit has recognized the significance of a hyperlink that is "underlined" in "***blue, contrasting text***," coupled together with other indicia. *Nguyen*, 763 F.3d at 1178 (emphasis added) (quoting *PDC Labs., Inc. v. Hach Co.*, 2009 WL 2605270, at *3 (C.D. Ill. Aug. 25, 2009) ("Terms [and Conditions of Sale] were hyperlinked on three separate pages of the online ... order process in ***underlined, blue, contrasting text***.") (emphasis added)); *Nguyen*, 763 F.3d at 1178 ("As in *PDC*, the checkout screens here contained "Terms of Use" hyperlinks in underlined, ***color-contrasting text***.") (emphasis added). The Ninth Circuit noted that in *PDC*, "the federal district court held that ***'[t]his contrasting text is sufficient to be considered conspicuous***,' thereby placing a reasonable user on notice that the terms applied." *Nguyen*, 763 F.3d at 1178 (emphasis added) (quoting *PDC*, 2009 WL 2605270, at *3)).

Notably, the Ninth Circuit elaborated that contrasting text, alone, was insufficient to make a hyperlink conspicuous. In particular, the Ninth Circuit noted that the district court in *PDC Labs, Inc.* made the observation that "the terms' conspicuousness was reinforced by the language of the final checkout screen, which read, " 'STEP 4 of 4: *Review terms*, add any comments, and submit order,' " and was followed by a hyperlink to the Terms. *Nguyen*, 763 F.3d at 1178 (emphasis added) (quoting *PDC Labs., Inc.*, 2009 WL 2605270, at *3)) (emphasis in original). Notably, Defendant has failed to cite any case authority indicating that the color gray indicates the existence of a hyperlink. Indeed, the California Court of Appeal recently held, "In the computing world, a hyperlink is a word, phrase, or image—typically underlined or ***in blue font***—that the user can click on to jump to a new document or a new section within the current document." *Sellers*, 73 Cal. App. 5th at 452 n.2 (emphasis added). The reference to "blue font" in *Sellers* is significant. Indeed, in *Sellers*, the Court of Appeal noted that the online merchant's "hyperlink to the terms of service ***is underlined, but it is not set apart in any other way***

***that may draw the attention of the consumer***, such as with ***blue text*** or capital letters." *Sellers*, 73 Cal. App. 5th at 481 (emphasis added).

Furthermore, the font of the "Terms & Conditions" hyperlink is very small print. In particular, it is in Arial font at 10.5 point size. (Ferrell Decl. ¶ 2 & Ex. 1.) In contrast, the statement, ""Buy *better*. Buy *less*. Wear *more*.," near the middle of the homepage is in the much larger 24 point size in Tines New Roman font. *Id.* ¶ 4. Similarly, the phrase, "SIGN UP FOR EMAIL," on the homepage near the bottom is in the much larger 18 point size. *Id.* ¶ 3.

Additionally, the hyperlink labeled as "Terms & Conditions" is in the same font (*i.e.*, Arial) and size (10.5 point) as the immediately surrounding language next to the hyperlink. (Ferrell Decl. ¶ 2.) Thus, the hyperlink "appear[s] in the same font . . . that, to the unwary [user], could blend in with the" rest of the textual statement in that same area. *Long*, 245 Cal. App. 4th at 866.

Finally, the existence of the hyperlink in Defendant's Website was inconspicuous because the hyperlink referred to "Terms & Conditions" instead of "Contract" or some other words stating that a contract between Defendant and the user should be reviewed. Indeed, in *Nguyen*, the Ninth Circuit noted that even with a color contrasting hyperlink and text, the crucial difference in *PDC Labs, Inc.* was that the final checkout screen contained the admonition, "*Review terms*." *Nguyen*, 763 F.3d at 1178 (emphasis in original). This admonition made a material difference to the outcome in *Nguyen*, 763 F.3d at 1178 ("This ["Review terms"] admonition makes *PDC* distinguishable, despite the court's explanation that the blue contrasting hyperlinks were sufficiently conspicuous on their own."). "Coloring can be for aesthetic purposes. ***Courts have required more than mere coloring to indicate the existence of a hyperlink to a contract***." *Applebaum*, 263 F. Supp. 3d at 467 (emphasis added). As such, the reasonable consumer would not have been able to discern that a hyperlink setting forth the Terms & Conditions was available for viewing if the user clicked on the hyperlink named "Terms & Conditions". That is surely a poor design flaw. If Defendant intended to inform consumers that there was a

hyperlink that should be clicked to read a legally binding contract, then Defendant should have designed its Website to notify users to review the Terms & Conditions.

**g. The "Terms & Conditions" Hyperlink at the Bottom of Each Webpage Is Buried Amongst 24 Hyperlinks.**

Any reliance on the "Terms & Conditions" hyperlink at the bottom of each webpage would be misplaced because such hyperlink is buried amongst 24 different hyperlinks in the tan background portion of all webpages at the bottom. (Ferrell Decl. ¶ 6 & Ex. 1); *Nguyen*, 763 F.3d at 1177 ("Where the link to a website's terms of use is buried at the bottom of the page . . . where users are unlikely to see it, courts have refused to enforce the . . . agreement."). The fact that there are so many hyperlinks that seem to have nothing to do with the Terms & Conditions is significant because the sheer volume of such hyperlinks distracts the average user from discerning that the Terms & Conditions are available to review.

**3. The Third *Berkson* Factor Is Neutral.**

Given that Plaintiff was not put in a position in which Defendant put before her physical manifestation of assent expected of a consumer seeking to purchase a product on its Website, the third *Berkson* factor is neutral.

**4. Defendant Did Not Clearly Draw the Consumer's Attention to Material Terms that Would Alter What a Reasonable Consumer Would Understand to Be Her Default Rights When Initiating an Online Consumer Transaction From the Consumer's State of Residence.**

The fourth *Berkson* factor does not support the existence of constructive notice of the Terms & Conditions because there is no evidence in the record showing that Defendant clearly drew Plaintiff's attention to the Terms & Conditions that would alter Plaintiff's understanding about her default rights had she engaged in an online consumer transaction with Defendant from Plaintiff's residence in California. For example, there is nothing to indicate that Defendant clearly drew Plaintiff's attention to the non-appearance based

arbitration clause in the Terms & Conditions given that Plaintiff is a California resident who expects the ability to attend hearings in person consistent with California law and practice. (Rodriguez Decl. ¶ 4.)

### 5. Plaintiff's Status as a "Tester" Proves Nothing About the Constructive Notice Analysis.

Notably, despite claiming that Plaintiff has opened multiple accounts and made purchases in the past, (Foley Decl. ¶ 5), Defendant omits claiming that any such prior purchases or opening of accounts put Plaintiff on constructive notice. Such omission speaks volumes.

Instead, Defendant contends that "Plaintiff has filed a number of lawsuits alleging privacy violations ***by other companies***." (Def.'s Mem. at 14:14-15.) But, by focusing exclusively on what Plaintiff should have known based on Plaintiff's interactions with other companies, Defendant ignores that the constructive knowledge inquiry in the Internet context is focused on what steps that the online website operator put together to design its website to put reasonable notice of the existence of the arbitration clause upon the consumer. *Wilson v. Huuuge, Inc.*, 944 F.3d 1212, 1220 (9th Cir. 2019) ("Users are put on constructive notice based on the conspicuousness and placement of the terms and conditions, as well as the content and overall design of the app."). Thus, Defendant's argument, which focuses entirely upon Plaintiff's conduct with respect to other businesses, is a red herring argument in purporting to establish Defendant's constructive notice upon reasonably prudent users of Defendant's Website.

Moreover, courts have only considered prior course of dealing with respect to a consumer's prior transactions with the same business and even in such circumstances, courts have rejected an inconspicuous hyperlink as providing constructive notice. *See Starke v. SquareTrade, Inc.*, 913 F.3d 279, 296 (2d Cir. 2019) (holding that consumer's past purchases from same seller did not put him on actual or inquiry notice of inconspicuous arbitration provision). *Starke* shows that repeated inconspicuous hyperlinks in websites do not put a consumer on inquiry notice.

**6. The Court Should Disregard Defendant's Bald Contention that Plaintiff's Counsel's Knowledge Should Be Counted as Plaintiff's Constructive Knowledge.**

Defendant's bald contention that Plaintiff's counsel's own knowledge should be counted as Plaintiff's constructive knowledge, (Def.'s Mem. at 15:5-9), is totally unsubstantiated by any relevant case authority.

**7. The Recent Decision in *Byars v. The Goodyear Tire and Rubber Co.* Is Directly on Point.**

*Byars v. The Goodyear Tire and Rubber Co.*, 2023 WL 1788553, id. at *3 (C.D. Cal. Feb. 3, 2023), is directly on point and provides significant guidance here.

**F. Defendant Has Waived the Enforcement of the Arbitration Clause.**

By moving to dismiss both the Complaint and the FAC under Rule 12(b)(1), (Docs. 12, 15), Defendant has acted inconsistently with its purported right to arbitrate.

The Supreme Court of the United States recently held that prejudice is not required to establish a waiver of the enforcement of an arbitration clause. *Morgan v. Sundance, Inc.*, 142 S. Ct. 1708, 1712-14 (2022). "In view of *Morgan*, the party asserting waiver must demonstrate: (1) knowledge of an existing right to compel arbitration and (2) intentional acts inconsistent with that existing right." *Armstrong v. Michaels Stores, Inc.*, 59 F.4th 1011, 1015 (9th Cir. 2023). In other words, the party asserting waiver need not demonstrate any prejudice under the post-*Morgan* waiver test.

Here, by filing its Motion to Dismiss on May 22 and 30, 2023, (Docs. 12, 15), Defendant has surely engaged in intentional acts that are inconsistent with its purported contract right to arbitrate the parties' dispute in this action. "Obviously, '[s]eeking a decision on the merits of a key issue in a case indicates an intentional and strategic decision to take advantage of the judicial forum.'" *Armstrong*, 59 F.4th at 1015 (quoting *Newirth ex rel. Newirth v. Aegis Senior Cmtys., LLC*, 931 F.3d 935, 941 (9th Cir. 2019)); *see also White v. Samsung Electronics America, Inc.*, 61 F.4th 334, 340 (3d Cir. 2023) ("Although motions to dismiss will not always evince an intent to litigate instead of

arbitrate, Samsung clearly sought to have this case dismissed by a court on the merits. Only after it was apparent that further litigation would be required, and it could not get the case fully dismissed before discovery, did Samsung attempt to arbitrate the remaining claim."); *id.* at 341 ("we will affirm the District Court's order holding that Samsung waived its right to arbitrate").

By seeking a decision that Plaintiff's claim for relief is "wholly insubstantial and frivolous," (Def.'s Mem. at 11:21), Defendant is essentially seeking a decision on the merits regardless of the label used for its Motion, which is characterized as a Motion brought under Rule 12(b)(1) seeking dismissal for lack of subject matter jurisdiction as opposed to Rule 12(b)(6).

**G. Whether "Gateway" Issues of Arbitrability Such as Enforceability Were Delegated to the Arbitrator Is Irrelevant to Deciding the Instant Motion.**

Although Defendant argues that gateway issues of arbitrability such as enforceability were delegated to the arbitrator to decide under its arbitration clause's provisions, (Def.'s Mem. at 15:16-22), such issue is irrelevant to deciding the instant Motion. As mentioned above, the crucial threshold question for the Court to decide (not the arbitrator) is whether a valid arbitration clause was agreed upon by the parties at all. *Berman v. Freedom Financial Network, LLC*, 30 F.4th 849, 855 (9th Cir. 2022); *Huuuge*, 944 F.3d at 1219. That is an issue for this Court to decide regardless of any delegation clause in an arbitration provision.

Notably, Defendant's Memorandum avoids citing any federal or state court decision that contradicts either *Berman* or *Huuuge*, which require this Court to decide whether a valid arbitration clause was agreed upon by the parties. Such omission speaks volumes. Defendant's thinly-veiled assumption that this Court cannot decide whether the parties assented to Defendant's online Terms & Conditions containing its arbitration provision because such arbitration clause contains a delegation clause is absurd.

Dated: June 21, 2023 PACIFIC TRIAL ATTORNEYS, P.C.

By: */s/ Scott J. Ferrell*

Scott J. Ferrell
Attorney for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on June 21, 2023, I electronically filed the foregoing **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S RESPONSE IN OPPOSITION TO MOTION TO DISMISS FIRST AMENDED COMPLAINT AND MOTION TO COMPEL ARBITRATION** with the Clerk of the Court using the CM/ECF system which will send notification of such filing via electronic mail to all counsel of record.

Dated: June 21, 2023

*/s/ Scott J. Ferrell*
Scott J. Ferrell